Hurl, J.
This is a proceeding in error brought to reverse the judgment of the court of common pleas. The plaintiff in error was also plainltiff below. A judgment was rendered against her and she brings this action to reverse that judgment. The defendant, William J. Gillette, is a physician and the action was brought against him by Ithe plaintiff to recover damages which she claims she sustained on account of his violation of his obligation to her as' a physician, during his employment by her to perform a certain operation and to care for her after such surgical operation was performed.
To the petition filed in the court of common pleas a demurrer was filed, on the ground that the action was barred by the statute of limitations. This demurrer was overruled. *666 The defendant then answered and the case came on for trial before the court and jury, and at the conclusion of the plaintiff’s testimony, the defendant, through his counsel, moved the court to direct the jury to return a verdict in favor of the defendant, upon the' ground thalb the evidence showed that the cause of action, if any, arose and was created more than one year before the filing of the petition, and was therefore .barred. This motion ithe court sustained and directed the jury to. return a verdict in favor of the defendant. A motion for a new trial was filed, overruled and judgment entered upon that verdict and this judgment is sought to be reversed.
Section 4983, Revised Statutes', as amended, provides that actions are barred within one year, as follows:
“An action for libel, slander, assault, battery, malicious-prosecution, false imprisonment or malpractice.”
It is claimed here by the defendant in error, and the same claim was made below, that this was an'action for malpractice and it was therefore barred within one year. The plaintiff in error claims that the action was in contract and not in 'tort, and, therefore, would not be barred under six years. The' claim of plaintiff in error is that the tort was waived and that the .plaintiff elected to sue in contract and that this appears from the petition.
The petition sets forth that the plaintiff was sick, and that on or about Nove'mber 1, 1897, she applied to the defendant to treat her professionally. That he accepted her retainer and' thereupon entered upon the treatment and cure of the plaintiff. That he informed her that she was suffering from appendicitis and that after that she went to the Toledo hospital for the performance of a surgical operation, and then proceeds as follows :
“That on or about the first day of November, 1897, plaintiff and defendant being at said hospital, pursuant to said arrangements, the defendant undertook to, and did, perform upon plaintiff, a surgical operation, opening her abdomen, and' among other things, removing therefrom a tumor. That deféhdanf while performing said operation, and in the performance thereof, -did úse, and did insert in the opening, so made in plaintiff’s abdomen, a cheese-cloth sponge, for the purpose- *667 of absorbing and taking up from said opening so made, in the performance of said operation, liberated blood, etc., which cheese-cloth sponge consisted of about eight layers of cheesecloth sewed together, and which layers were about two inches in width by three inches in length. That defendant, without the knowledge or consent of plaintiff, did carelessly and negligently, and in violation of the obligations of his contract of employment, leave said cheese-cloth sponge in the opening by him made in the performance of said operation, and in the abdomen of the plaintiff, and did carelessly and negligently, and without the knowledge or consent of plaintiff, close said opening without removing said cheese-cloth sponge therefrom. That for more than eighteen months thereafter, plaintiff was continuously sick of said malady, and for more than twelve months thereafter, viz., from about November i, 1897, to about December 1, 1898, defendant continued under his retainer and employment to treat and counsel plaintiff concerning the same, and during all of which latter time, and upon each and every day thereof, without, the'knowledge or consent of said plaintiff, said defendant, knowingly, carelessly and negligently, and in disUegard of his duties and obligations under said contract of employment, permitted said cheesecloth sponge to remain in said plaintiff’s abdomen. That on account of defendant’s so leaving said cheese-cloth sponge in-plaintiff’s said abdomen, and enclosing the same, and -on account of defendant’s so permitting -said cheese-cloth sponge to remain enclosed as aforesaid in plaintiff’s said abdomen, upon and during the days, and each and every one off, the days aforesaid, a running painful sore, continually discharging offensive pus, requiring constant care and attention, was-created and maintained, and plaintiff was made sick, etc.”
The petition proceeds to state the injuries 'which the plaintiff claims to have sustained and asks for damages.
. The answer is in the nature of a general denial, -except that it is admitted the operation was performed, and pleads the bar of the statute of limitations.
The petition was filed June '27, 1899, and the summons issued and- the action commenced on that day. The court, after the evidence was all'in, was of the opinion that no cause *668 of action had accrued to the plaintiff within one year before the commencement of the action, and, for that reason, directed a verdict for the defendant. (See 8 N. P., 389.)
As suggested, it is claimed by the plaintiff in error that this action is not within the one year statute; that it does not sound in tort but in contract, and therefore, it comes within section 4981, Revised Statutes, which provides that an action upon a contract not in writing, either express or implied, shall be commenced within six years; and attention is called to the language of the petition, to-wit, that it is charged that the defendant, without the knowledge or consent of the plaintiff, carelessly, negligently and in violation of the obligation of his contract, left said cheese-cloth sponge in the opening made by him in the performance of said operation, etc., and it is alleged that the action here is for the violation of a contract, to-wit, that he would perform this operation carefully and prudently and with ordinary care and in the exercise of ordinary skill, and that in violation of that obligation of the contract he did. these things which are charged.
, It is true that there is, in nearly all such cases, a contract, either express or implied, between the physician or surgeon and his patient. As was suggested in argument, if a physician should undertake the treatment of a man who was insane, or unconscious at the time hie undertook his treatment, it could hardly be said that there was any contract, but in the ordinary-case, there is either an express contract made by the parties or the law implies a contraot of service imposing upon the physician certain duties or obligations, and, among other things that of ordinary care and skill in the treatment of the patient. And this petition sets forth the obligation and the violation of the obligation, in the ordinary way.
Is the action here upon a contract, or is it for negligence, for what is commonly known as malpractice?
The word used in section 4983, Revised Statutes, limiting a right of action to one year, is “malpractice.” It will not be out of place to have a definition of malpractice and to ascertain what the legislature probably had in mind when they amended that statute, in 1894, by adding the word “malpractice,” there being no express provision limiting actions for *669 malpractice prior to that time, but they being controlled by the four year statute, section 4982, Revised Statutes, the general provision for injuries'to the rights of persons.
Webster defines malpractice as derived from mal and practice; “ * * * especially professional misconduct.” A definition is found in 1 Witthaus & Becker’s Med. Jur. 73: “Malpractice may be defined to be — First: Willful acts on the part of a physician or surgeon toward a person under his care, by which such person suffers death or injury. Second: Acts forbidden by express statute, on ‘the part of a physician or surgeon, toward a person under his care, by which such person suffers death or injury. Third: Negligent acts on the part of a physician or surgeon in treating a patient, by means of which such patient suffers death or unnecessary injury.”
According to these definitions, malpractice is mal or bad practice, and it may be defined generally as negligent acts committed by a physician in treating his patient.
Though the service rendered to the patient is upon contract, as suggested, it seems to us that the cause of action for malpractice — for the negligent performance of the contract — rests on negligence and that this aotion is in tort and not in contract. The claim of the plaintiff is, 'that the defendant negligently performed the duties and obligations which were incumbent upon him to perform by virtue of a contract for service which existed between her and the physician. This question has been passed upon by the circuit court of Ohio in Shuman v. Drayton, 14 C. C., 328.
The first paragraph of the syllabus is:
“The cause of action for malpractice, though the' service rendered is on contract, express or implied, arises on negligence, or the failure to exercise due care and skill and not necessarily involving either malice or willful wrongdoing.”
And on page 14 the court say, through Judge Day, delivering the opinion:
“True, the service is rendered on contract, either express or implied, but the cause of action arises altogether on the negligence, the omission to exercise due care or due skill in the rendition of the service on the part of the person sought to be charged. Nor is there present necessarily, or even probably, *670 the element of malice or willful wrongdoing, although that element may be present.”
We are of the opinion that the ordinary meaning of malpractice, the meaning with which it isi used generally, is the negligent performance by a physician of the duties which are devolved and incumbent upon him on account of his contractual relations with his patient, and that the legislature in adding the term malpractice, to 'this statute intended to cover all of that class of cases and to use the word with its ordinary meaning. We, therefore, are of the opinion that this action falls within the one year limitation. Section 4983, Revised Statutes.
The question for consideration then, is: Whether the court erred, after the plaintiff’s evidence was in, in directing a verdict for the defendant on the ground that the facts as they appeared showed that no cause of action had accrued within one year bleforje June 27, 1899, the day the 'action was commenced.
The general duties of a physician are well established by the authorities, and, as laid down everywhere, practically, he is bound to use ordinary care and skill in the practice of his profession where he is situated, and it is his duty when he once enters upon the treatment of a patient to continue the -treatment and to continue the exercise of such ordinary care and skill until he has been discharged by the patient or has himself withdrawn from such service; and, before he can withdraw, it is necessary for him to give reasonable notice to the patient, in order that another physician may be procured, the character of the services of a physician being such and his relation to his patient being such, that he.is not permitted, under the law, to arbitrarily quit the service at any time, without any cause, and leave his patient without' medical attendance, but he must give reasonable notice, though the patient may discharge him at any time.
These general principles bear upon the duty of the defendant in this case and upon the question as to zvhen his relation with plaintiff as a physician ceased. The Supreme Court say in Craig v. Chambers, 17 Ohio St., 254:
“The implied liability of a surgeon, retained to treat a case professionally, extends no further, in the absence of a special *671 agreement, than that he will indemnify his patient against any ■injurious consequences resulting from his want of the proper degree of skill, care or diligence in the execution of his employment. And in an action against the surgeon for malpractice, the plaintiff, if he shows no injury resulting from negligence, or want of due skill in the defendant, will not be entitled to recover nominal damages.”
The question is discussed in Shearman & Redfield on Negligence, section 606:
“The general rule, therefore, is that a medical man who attends for a fee, is liable for such amount of ordinary care, diligence or skill on his part as leads to the injury of his patient.”
“Section 613. The peculiar nature of the services which a medical man undertakes to render often makes it his duty to continue them long after he would gladly cease to do so. He may, indeed, decline absolutely to take charge of a case, but having once begun the task, he cannot abandon it freely. Even if his services are gratuitous, he must continue them until a reasonable time has been given to procure other attendance, and if he is attending gratuitously he has no right to desert a patient before the end of an illness which he undertook to treat, without reasonable cause. The propriety of this rule is obvious in some instances and is easily demonstrable in all cases. Thus, no one can doubt that even where his attendance was gratuitous, a surgeon could not be allowed to cut off a limb and then leave him to stop the flow of blood as best he could; and this, although an extreme case, proves that there must be a rule adequate to secure justice for such a case. 'That a paid physician must continue his attendance, if desired, until the emergency which he was called to meet is past, seems to be not only reasonable in itself but to be sustained by analogy from thte rule which requires lawyers to take their client’s cases to trial and judgment after they have once undertaken them. If personal attendance is no longer necessary, as in the treatment of an injured limb, he should, if the casie calls for it, give the patient instructions as to its care, and a failure to ■do so is actionable negligence.”
*672 And this states the rule substantially as laid down in most of the cases, some of which will be referred to later.
The duty, then, of the defendant was to perform this operation with ordinary care and skill, and to treat the plaintiff thereafter as long as she required personal attention in healing and curing her of the injury caused by the operation. It appears that this operation was performed November 3, 1897. She remained at the hospital until December 5, following; and the defendant alleges in his answer that he had no further charge of her after that, and it is claimed that the evidence does not show that he had any charge of her or did anything for her as a physician after April, 1898 — which was more than a year before the commendement of the action- — -and that therefore the court was justified in directing a verdict for the defendant.
It will be necessary to look at some of the evidence which was offered by the plaintiff to determine this question. It appears from the testimony that in the latter part of October or the first of November, 1897, the plaintiff was, and for some time had been, suffering pain in the abdominal region, and not knowing what the nature of the malady was, she applied to -the defendant, Dr. Gillette, about November 1, or the latter part of October, and he made an examination of her.in the presence of her husband, and pronounced her trouble appendicitis and fold her and her husband that it would be necessary to have an operation performed to cure her, and they appeared to be willing that such an operation should be performed. Soon after that she went to the hospital, and on November 3, 1897, an operation was performed, at the hospital' in Toledo, where Dr. Gillette had a room for his own operations. He made an incision on the right side of the abdomen, the inguinal region, it is called, in the presence of the plaintiff’s husband and of the nurses and attendants at the hospital and one or two physicians. Upon an examination of this region, after the incision was made, it was found that there was notroubl-e with the appendix, that it was normal and healthy. It was taken out by the doctor in his hand and seen by physicians and nurses and appeared to.be in sound and healthy condition, so that it was clear that her trouble was not appendicitis-
*673 In performing this operation, however, the doctor discovered something that led him to believe that there was trouble in the middle portion of the abdomen; near the median line, as it is called, and the incision in the right side was cleansed and closed up. Then, it is claimed, was when the cheese-cloth was left in her abdomlen. A second incision was then made, in the median line, just below the navel, and there the cause of her trouble was found, which consisted of what is called hematoma, or blood tumor, the result of an extra-uterine pregnancy. This hematoma and one of the fallopian tubes, and possibly some other organ, were removed and the incision was closed and the treatment of plaintiff began at the hospital.
She remained there about five weeks. Soon after the operation, perhaps within a few days, the first incision began to discharge pus and was painful, but on December 5, 1897, the doctor permitted her to be taken home, and the plaintiff testifies that she thereafter remained in bed five months and this first incision or opening continued to discharge pus, during all this time, apparently of a very virulent character, and so continued, accompanied by severe pain. Finally, in March, she went to the doctor’s office again. Before that, however, about two weeks after she came home, the doctor came to the house and removed the stiches from the second incision, which was giving her some pain, and at that time, in December, it seems that the first incision was getting no better and continued to discharge pus, and in March she visited the doctor at his office and I will read from her testimony.
She said to him: “Well, doctor, I don’t seem to get any better.” And he says “How is that ?” I says, “It runs just the same as it did; how soon will it run out ?” He says, “That I can’t tell; sometimes it takes longer than others; sometimes that tendon is absorbed in three months and sometimes it takes longer. If you will just have patience it will run out and it will heal up and you will be all right.”
The doctor was apparently of the opinion then that this difficulty was due to a Kangaroo tendon which was used in sewing up and dosing the incision. On page 38 of the record is this: “I told him my side was no better, and he said, ‘That is funny that it won’t get better,’ and he said if we would just *674 have patience that it would absorb and run out. After that he told my husband he ought to have some money.” The agreed price for the operation was twenty-five dollars!, in addition to her weekly expenses ait the hospital. “My husband says, 'When my wife is well, doctor, you will get your money.’ He says, “If that is the case, you bring your wife to the hospital in the morning and'I will have my money inside of a week.” He says, “I will take that tendon out and it will heal up then.” Her husband asked him if she would have to take an anaesthetic, and he said no, it wouldn’t be necessary.
On the following day her husband took her to the hospital and he met the doctor there, who made an examination in the presence of the nurses, she being given no anaesthetic, except some cocaine applied locally, and upon examination he 'took hold of something with an instrument that he thought was causing trouble, and she says she heard .him say, “I believe that is it,” and I could feel him pull on something, and then he said “There, it has parted.”
Then they had some talk in which the doctor said he could give an anaesthetic and take it out but he would have to open the whole incision. Her husband asked him if he thought it ought to be done, and thte dcctor said: “No, it is not necessary; if you will just have patience it will run out, and be all right.” “My husband said, ‘Well, if you think it will run out, it is no use to torture my wife with any more; she has suffered about all she can.’ ”
He performed no operation and she went away. She says it continued to discharge pus “even more than it had before, I thought, and it commenced to be of a kind of thick, greenish color after that.”
After the doctor had said it would run out, as I have read from the record, she remained .away from the doctor until November following, about five months. It. continued during all that time to discharge pus and it was necessary for her to wear a bandage and to have it dressed frequently by her husband, and, according to her testimony, she suffered severe pain. About the first of November, the wound not being healed and the pus still discharging, she visited the doctor at his office.
*675 It is claimed by the defendant in error that the examination .at the hospital in April wasi the last act done by the doctor which could be considered as an act done by him as her physician, and that whatever cause of action she had had accrued at that time, and that what occurred after that and in November following, could not be regarded as giving her any cause ■of adtion, and therefore, it is argued that the claim was barred.
When she went to his office she says : “He was in his office, •and he came and shook hands and asked me how I was getting •along, and I said ‘Well, doctor, I am not getting along very well,’ and he says ‘Is not that healed up yet? I says, No, sir, it has not.’ He says, ‘You take a chair and I will be at leisure in a minute.’ There was gentleman in his private office, and he talked with him a little while, and after a while this gentleman got up and went away and then he called me into his private office and says, ‘Isn’t there any change in that ?’ I says, ‘No, sir, there isn’t, it is just about the same,’ and he says, ‘That is funny, that it don’t get bettíer.’ I says, ‘Well, doctor, it seems to me that if you had done your work right I would have been well,’ and at that he got very mad, indeed, at me and he says, ‘Well, if that is the way you feel about it, Mrs. Tucker, you can get right out of my offic'e; I wouldn’t do any more for you now if I could,’ he says, ‘under no consideration.’ I says, “I don’t know, doctor, — I am not in a hurry.’ And he says, ‘You get right out of my office or I will have an officer put you out.’ He opened the door and I went out into the other office and my friend was there, and he says, T want you to go out of my office or I will have an officer put you out.’ And my friend says, ‘You don’t need to have an officer put me out, — I wijl go;’ and at that we went out and I have not seen Dr. Gillette since until I saw him in the court room.”
Soon after that, perhaps the same day, she employed counsel, who communicated with Dr. Gillette. She never went to the defendant after that and had no further communications with him as her physician, but after this occurrence she employed Dr. Gundrum as a physician who treated her and saw her several times, and, in the following April, performed an operation upon her at the same hospital and opened the incision in the right side of the abdomen, and found, two or three incheis *676 below the surface of the 'skin, a cheese-cloth sponge consisting of eight layers of oheese-cloth, three inches long and about two inches: in width. This was saturated with pus and other matter and was removed by him at that time, and in his opinion and in the opinion of other medical witnesses who were called, her condition during the period after -the operation by Dr. Gillette, and the condition of the wound, discharging pus,, and causing pain, was due to the presence of this cheesie-cloth sponge, in the abdomen. The medical testimony that was! produced'by plaintiff tended to show that after a reasonable-period had elapsed from the time of the operation, the wound continuing to discharge pus, would indicate that there was some foreign matter or substance in the wound which should be removed.
At the conclusion of the plaintiff’s testimony, as has been stated, the court being of the opinion that, under the facts as shown By the plaintiff’s testimony and that offered by her, the action was barred, a verdict was directed for the defendant.
The question is, when her last cause of action against the defendant accrued, or when her cause of action against the defendant was complete ,the defendant in error claiming that,, at the most, his treatment of her as a physician ceased in April, 1898, when he last met her at the hospital and discussed with her the performance of an operation and finally told her that whatever the trouble was, it would run out and she would be all right, that an operation was not necessary. The claim is. that she did not call upon him after that until November and. did not ask him to call on her, and that, therefore, as the court below held that was the last aGt of his as a physician and that therefore the claim was barred.
After the performance of an operation it is the duty of the surgeon to continue in attendance upon the patient as long as his personal services are required until the person i-s cured of the operation that has: been performed or until the attendance of the physician is no longer necessary. This duty is as incumbent upon him as the duty of exercising ordinary care and skill in the actual performance of the operation, as was-suggested in one of the authorities read, he could not cut a man’s leg off and at once abandon -him to stop the flow of *677 Hood as best he could, nor could he perform such an operation .as this upon a person and leave her without proper treatment thereafter. This question is discussed in Ballou v. Prescott, 64 Maine, 306, where the Supreme Court of Maine say:
“If he ble sent for (meaning the physician) at the time of an injury by one whose family physician he has been for years, the effect of his responding to the call will be an engagement to attend to the case, so long as it requires attention, unless he gives notice to the contrary or is discharged by the patient; and he is bound to use ordinary care and skill, not only in his .attendance, but in determining when it may be safely and •properly discontinued.
“If a surgeon called to attend one who has long been his employer, leaves his patient before he has been properly ■cared for professionally, or while he needs further attention, and relies upon an alleged discharge by the patient as a defense to a suit brought for the abandonment; this being a new substantive matter of defense, the burden of proving it is upon the defendant.”
And the question is fully discussed in the opinion. And the court say, on page 313:
“If he is called to attend in the usual manner, and undertakes to do so by word or act, nothing being said or done to modify this undertaking, it is quite clear as a legal proposition that not only reasonable care and skill should be exercised, but also continued attention, so long as the condition ■of the patient might require it, in the exercise of an honest and properly educated judgment, and certainly any culpable negligence in this respect would render him liable in an .action.” •
To the same effect is Williams v. Gilman, 71 Maine, 21, where the court held that after performing an operation upon a young colt:
“It was the duty of the defendant to give the colt such continued further attention, after the operation, as the necessity of the case required, in the absence of special agreement or reasonable notice to the contrary, etc.”
In the case of false imprisonment, it has been held that the ■cause of action for alleged false imprisonment is not complete *678 until the imprisonment is ended, i Wood Limitations, 4541 and this is sustained by a case in New York, 8 Daly, 537, a common pleas decision by Judge Van Brunt. In 26 Conn., 324, the court say, in the syllabus:
“When an injury, however slight, 'is complete as a legal injury at the time of the act, the period of limitation at once commences; but when the act is not legally injurious until certain consequences occur, the period takes date from the consequential injury.”
It is urged by the defendant in error that the cause of action accrued at the time the inj ury was committed, i. e.: at the time of the operation and riot at the time the damage resulted. That is, undoubtedly, the true rule. It is laid down in Kerns v. Schoomaker, 4 Ohio, 331 [22 Am. Dec. 757], and in Wilcox v. Plummer, [29 U. S.] 4 Peters, 172. The last mentioned case' was an action against an attorney who had made the wrong person party plaintiff in an action on a promissory note and his client was injured thereby. The court held that the statute of limitations began to run from the time of the blunder, as the court called it, and not from the time of the damage suffered therefrom.
In this case, it appears that the doctor undertook to perform this operation. The evidence tends to show that he left in this incision a cheese-cloth sponge; that within a short time-thereafter the wound began to suppurate and discharge pus ; that it continued to discharge during the entire period until' the second operation was performed by Dr. Gundrum, eighteen months thereafter; that he was informed of this before the patient left the hospital; that he was informed again two weeks after her return home; lie was informed again in the following March that it was still suppurating and not healed' and was giving her pain. He met her again at his, room in the hospital in the following April, when the discussion was had in reference to performing an operation, and he said to* her then that it would run out if she would go home and be patient. Then she went away, with the wound still discharging pus. The doctor had not yet been paid. He knew that this patient was not yet cured of this operation. He knew that the wound was still discharging pus,- and according to' *679 the medical testimony, he ought to have known that this discharge might be due, and probably was due, to some foreign substance in the abdomen. He made no investigation, did not open the wound or make any attempt to ascertain the cause of the trouble, any farther than suggested. He knew during the summer of 1898, that she had been in 'this condition .in April when he last saw her. She, like all other patients, committed her case fully, as a patient should, to her doctor and reposed implicit confidence in him, doing what he told her to-do and refraining from what he told hfer not to do. If he said an operation was necessary, it was performed; if he said it would run out and an operation was not necessary, she permitted it to go without an operation. She continued that during all of the summer and the wound continued to run- and had never healed, when she went back again in November, 1898. He had never been discharged as her physician. There-still was incumbent upon him the duty to look after her and care for her with ordinary care and prudence until she was healed. He had never been paid for his services. He had never withdrawn from the case. The defendant gave no notice of his intention to withdraw when she first met him in his office in November, 1898, a year after the operation; he said nothing indicating that he regarded himself as discharged or as having withdrawn from the case. He expressed surprise that the wound had not healed, invited her into his office and evidently intended to make an examination of her to see if he could ascertain what the trouble was, but when she said to him, “Well, doctor, it seems to me that if you had done your work right I would have been well,” he became angry and ordered her out of his office. That is the first we find in the record of any testimony showing a dissolution of the relation that had existed between Mrs. Tucker and Dr. Gillette as physician and patient.
In our judgment, after a reasonable time had elapsed from the performance of this operation, if its condition -was such that it would indicate to a reasonably prudent surgeon that there was a foreign substance in the wound, whether his conduct was such as to constitute negligence, was a question ■ for the jury, and under these facts, it seems to us that it was- *680 a continuing injury to her. He was all the time her physician. It was- on'e case, one treatment; it was all the time his duty to perform with ordinary care; all the time his duty to remove the foreign substance, if there was any, in the wound, if he, as a physician of ordinary care and skill, had reasonable ground to suppose and believe that there was such a foreign substance in the wound, as shown from this condition and the suppuration. If the facts were as she testifies, then it was a continuing act of negligence on his part. If a physician is called to treat a man 'for a fever and he pronounces it malarial fever and treats him three or four weeks for that, and it turns out to be typhoid fever,.it is one continuous act of negligence on his part f the statute does not begin to run from the first day he comes; but the charge, as the court say in the case of false imprisonment, is not complete until it is ended and the statute of limitations does not begin to run until the wrong is ended.
If the defendant was guilty of any negligence in November, 1898, when she called on him at his office, that would constitute a cause of action, of course, in itself. But, in our judgment, if a surgeon is negligent in failing to act, as is. claimed here, if he is negligent in that respect, it is a continuing wrong. Plaintiffs claim for damages on account of the act itself of the defendant leaving the cheese-cloth sponge in the incision, in November, 1897, was barred, but what she complains of here is negligence in not giving her proper treatment,' in the way of opening the wound or otherwise, and removing the foreign substance left in the incision. And if it be true that he was guilty of negligence in that respect, then, in our opinion, that' was a continuing act of negligence, which increased rather than diminished as time went on, and it became more evident that there was some foreign substance in the wound which should be removed. It does not seem to us that either Mrs. Tucker or the physician, until they parted in November, 1899, had any thought that their relations as physician and patient had terminated. The wound was not healed and she was still his patient and he still owed her the duty of a physidan and surgeon who had performed an operation. Her cause of action was not complete and the statute did not *681 begin to run until such relation ceased at his office in November, 1898.
James M. Brown, for Plaintiff in Error.
David R. Austin, George F. Wells and M. A. Norris, for Defendant in Error.
The doctor could not relieve himself from this obligation, which had continued from the time of the operation, by severing his relations with her when she called on him in his office. If she required still further treatment, it was his duty to give to her, and examine her if necessary, and although the relation may have terminated and did terminate at that time, his action would certainly not relate back to any period of time prior to November, 1898, when they last met.
Holding these views, we are of the opinion that the court of common pleas erred in instructing the jury to return a verdict for the defendant; that the case should have been heard and submitted to the jury upon proper instructions. Tor these reasons the judgment of the court of common pleas will be reversed.

James M. Brown, for Plaintiff in Error, cited:
Care and skill required: Witthaus & Becker, Med. Juris, (x ed.) p. 30; Enc. of Law (1 ed.), vol. 14, p. 76; Gallaher v. Thompson, Wright 466; Craig v. Chambers, 17 Ohio St. 253; 14 Am. & Eng. Enc. Law (1 ed.), p. 78, and cases cited; 18 Ib. p. 439; Lamphire v. Phipas, 8 Car. & P. 475; 1 Witthaus & Becker, Med. Jur. pp. 26, 29; Potter v. Virgil, 37 Bar. 578; Terre Haute Ry. v. Stockwell, 20 N. E. Rep. 650 [118 Ind. 98]; Dale v. Lumber Co. 2 S. W. Rep. 703 [48 Ark. 188; 3 Am. St. Rep. 224; Bradley v. Dodge, 45 How. Pr. 51.
Physician bound to necessary attendance and services after surgical operation: Williams v. Gilman, 71 Me. 21, 24; Ballou v. Prescott, 64 Me. 312, 314; Sherman & Redf. Neg. sec. 441.
Limitations: Wood on Limitations, sec. 1, p. 1; sec. 4, p. 7; sec. 4, p. 8; sec. 5, p. 9.
Our limitation law: Sec. 4976; S. & C. 943; 51v. p. 57, sec. 8. Appropos Columbus S. & C. R. R. v. Mowatt, 35 Ohio St. 284, 288; secs. 4979, 4981, 4983, Rev. Stat.
Tort may be waived and suit brought in assumpsit: Barker v. Cory, 15 Ohio, 9, 12; Wood on Limitations (2 ed.), secs. 20, 21; Holleck v. Nexier, 16 Col. 574; Vasse v. Smith, 6 Cranch (U. S.), 226; Stoyle v. Westcott, 2 Day (Conn.), 422; Babcock v. Philips, 38 Ga. 216; Honey v. Honey, 1 Sim. & Stev. 560; See Jones v. Hoar, 5 Pick. 285; Willett *682 v. Willett, 3 Watts (Penn.), 277; Ivory v. Owens, 28 Ala. 641; Marten v. Brooklyn, 1 Hill (N. Y.) 545; See also Mayer v. Mann, 19 Pick. (Mon.), 535; See also Ayers v. Watte, 10 Cush. (Mass.) 72; Harmon v. Harmon, 123 Mass. 441; Hanna v. Wilson 3 Gratt. (Va.) 242 [46 Am. Dec. 190]; Coles v. Matthews, 33 Gratt. (Va.) 186; Elkins v. Edmunds, 8 Ga. 325; Pratt v. Huggins, 29 Barb. (N. Y.) 277; Warst v. Cooney, 15 (N. Y.) 505; Belknap v. Gleason, 11 Conn. 160 [27 Am. Dec. 721]; Miller v. College, 14 Mass. 651; Jay v. Adams, 26 Me. 330; Wiswell v. Baxter, 20 Wis. 713; Cokes v. Culbertson, 9 Nev. 199; 1 Wood on Lim. (2 ed.) p. 61; Fisher v. Mossman, 11 Ohio St. 42.
Election of remedies: 7 Enc. PI. & Pr. pp. 361, 361-362, 362, 363, 368, 371; Barker v. Cory, 15 Ohio, 9, 13; Dixon v. Caldwell, 15 Ohio St. 412, 415 [86 Am. Dec. 487]; Klonne v. Bradstreet, 7 Ohio St. 322, 325; Bouvier’s Dictionary, title, Torts; Hill on Torts; p. 1; Pollock on Tort's, 4; O’Callaghan v. Cronan, 121 Mass. 114; Mahan v. Brown, 13 Wend. 261 [28. Am. Dec. 461]; Rich v. New York, etc. Co. 87 N. Y. 382; See Bishop on Contr. (Enl. Ed.) sec. 1355; 26 Am. & Eng. Enc. Law, pp. 72, 73.
What is a continuing contract? 1 Wood on Lim. (2 ed.) p. 330; Foster v. Jack, 4 Watts (Pa.), 234; 55 Pa. St. 434; Adams v. Fort Plain Bank, 36 N. Y. 255; see also Wood on Lim. (2 ed.) sec. 121, 122.
Delay induced by defendant will prevent the bar of the statute: Mickey v. Insurance Co. 35 Iowa, 174; Curtis v. Insurance Co. 1 Biss. (U. S.) 485; Brady v. Insurance Co. 17 U. S. (4 Wheat.) 597; Ripley v. Insurance Co. 17 How. Pr. 444; Coursin v. Insurance Co. 46 Pa. St. 323; Insurance Co. v. Meyer, 93 Ill. 271; Derrick v. Insurance Co. 74 Ill. 404; Wood on Limitations (2 ed.), sec. 49, pp. 106-7.